[No. D061553. Fourth Dist., Div. One. Jan. 7, 2013.]

In re MARQUIS H., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
DARNELL H. et al., Defendants and Appellants.

**COUNSEL**

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Darnell H.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant R.H.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Jamie A. Moran, under appointment by the Court of Appeal, for Minor.

**OPINION**

**McCONNELL, P. J.**—Darnell H. and R.H. (the parents) appeal an order in which the juvenile court assumed jurisdiction over their son, Marquis H., under Welfare and Institutions Code[1] section 300, subdivision (a), based on a risk of serious physical harm. The parents did not physically abuse Marquis, but seriously abused two of their grandchildren, L.M. and T.S., who were also

---

[1] Further statutory references are also to the Welfare and Institutions Code except when otherwise specified.

in their custody. The parents contend the statute is inapplicable because it allows jurisdiction based on "a history of repeated inflictions of injuries on the child or the *child's siblings*" (§ 300, subd. (a), italics added), and Marquis and their grandchildren are not siblings. We conclude the parents have misinterpreted section 300, subdivision (a), and the quoted language is but one example of when the juvenile court may exercise jurisdiction based on physical abuse or the risk thereof. We also reject the parents' challenge to the sufficiency of the evidence. We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2011 the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of Marquis, who was then 10 years old, under section 300, subdivision (a). The petition did not allege any direct abuse to Marquis. Rather, it alleged that during the preceding weeks R.H. subjected L.M., who was then 13 years old, to serious physical abuse by burning her with an iron and hitting her repeatedly with an extension cord, a crutch, and a fist. The juvenile court made a prima facie finding on the petition and removed Marquis from the home.[2]

In January 2012 the Agency filed an amended petition to add the allegation that both parents hit nine-year-old T.S. with an extension cord, causing scarring of his back and left arm; stomped on him, causing a scar on his torso; and hit him with a bat and crutches. Additionally, it alleged R.H. put a lighted cigarette on T.S.'s shin, and the parents made T.S. and L.M. sleep on the kitchen floor for discipline. The court also made a prima facie finding on the amended petition.

A contested jurisdiction and disposition hearing was held over several days in February and March 2012. Dr. Jennifer Davis, a pediatrician with Rady Children's Hospital, testified about her examination of L.M., during which L.M. was "very reserved" and had a "flat affect." L.M. had a laceration near the left eyebrow with bruising around the whole eye, temple, and nasal bridge, and lacerations inside her cheek. She reported the injuries were caused by "being hit with a crutch and a bat." She also had scarring on a finger, which she attributed to being struck by a crutch. L.M. also had a healing laceration to her left ear and a "cauliflower" ear, meaning a permanent "thickening and deformity of the ear" caused by repeated blows, and a healing laceration to her right ear. L.M. reported she had been "hit in the ear so many times." When Dr. Davis asked L.M. who hit her, she said, "[U]sually grandma," but "occasionally grandpa is involved," and sometimes Marquis.

---

[2] L.M. and T.S. were also removed from the home, along with their younger sister, L.S., whom the parents were in the process of adopting. The parents have a lengthy history with child protective services pertaining to the physical, sexual, and emotional abuse of R.H.'s daughter, who is the mother of these grandchildren.

Additionally, L.M. had a scar on her left arm and shoulder, which left the partial outline of an iron and individual steam holes. L.M. reported that her grandmother burned her with an iron about a month earlier. Dr. Davis testified that "[a]ccidental burns don't typically leave such a clear and nice outline," and the location of the burn indicated it was not accidental. L.M. also had a hematoma on the back of her left thigh, and she reported it was caused by being hit with an electrical cord several days earlier. Further, she reported that a scar near her kidney was caused by "being hit with a broomstick awhile ago," and a scar to her clavicle area was caused by "being hit with a rubber end of a crutch." Dr. Davis concluded L.M. was subjected to "repeated, severe, longstanding physical abuse."

Dr. Davis also testified she reviewed Dr. Nancy Graff's medical findings for T.S., and photographs of numerous marks on his body. Dr. Graff concluded many of T.S.'s "scars are geometric and are most compatible with being struck with . . . objects e.g., belts or cords." T.S. had linear and "double linear" scars on his back, a scar on the side of his abdomen that appeared to be from a burn, linear marks on his right thigh, and a clear loop mark on the back of his left arm.

Dr. Davis agreed with Dr. Graff's assessment, and added that "[l]inear patterns are usually indicative of being struck with some type of an object." Further, she testified that a loop mark "is absolutely abuse. It doesn't matter what [T.S.] says or anyone else says. A looped mark is a very well recognized patterned injury. There is no real way to get this accidentally." In her view, T.S. sustained injuries consistent with being hit with an electrical cord, a bat, and crutches.

L.M. testified that one morning before school her grandmother punched her and gave her a black eye because she was doing her chores incorrectly. The previous day, her grandmother hit her with a blow-dryer and cut her eye. Another time, her grandmother burned her left arm with an iron and sent her to her room in tears. The next day L.M.'s mother came over and the grandmother lied and said L.M. burned herself. L.M.'s grandmother told her not to tell anyone about the burn and to hide it with long-sleeved clothing.

L.M. also testified her grandmother hit her face and body with a crutch almost daily when she did not perform her chores or performed them incorrectly. Further, she said her grandmother "hit me with the extension cord and the broom . . . or my grandpa hit me with the broom in my face." She elaborated that he hit her with the broom handle, which was broken and sharp. She also testified Marquis got angry with her and "got a bat and started hitting me with it," giving her a bloody nose.

Additionally, L.M. testified she saw Marquis hit T.S. with a bat. Further, her grandfather "was hitting [T.S.] with [boxing] gloves back and forth" and T.S. "got choked out." L.M. demonstrated by encircling her hands around the neck of a stuffed teddy bear that she held while testifying. She explained that during the incident her grandparents kept "grabbing [T.S.] and trying to hit him more," and "[h]e kept passing out."

T.S. testified he originally denied he was abused because he was afraid "I might get hit with something." He testified that his grandmother hit him on his buttocks with his grandfather's belt more than once, and in one incident she slapped him with her hands "a lot of times" and made his lips bleed. Both grandparents struck him with a crutch on his back and his face. His grandfather hit him with an extension cord "hard" and "a lot of times," and he was naked when he was struck on the back of his arm with the electrical cord.

Additionally, T.S. testified both grandparents and Marquis struck him on his ribs with a baseball bat, and he got a mark on his back when both grandparents were "stomping me on the ground." Further, T.S. said his grandfather put on boxing gloves "and he socked me on the wall and I had dents." He explained the dents were on his forehead. He was sad because his grandparents made him sleep on the kitchen floor. T.S. testified he saw L.M. get "hit with everything that I got hit with."

Dr. Sara Maltzman was the Agency's senior staff psychologist. She testified that L.M.'s psychological evaluation indicated she was suffering from post-traumatic stress disorder. L.M. reported her physical abuse had been going on for three years. Dr. Maltzman was aware that Marquis was denying any abuse in the home, and she believed he was lying.

After the presentation of evidence, the parents both moved for dismissal of the petition under section 350, subdivision (c), on the ground Marquis was not physically abused himself or at risk of future abuse. Marquis's trial counsel joined in the motion.[3] The court denied the motion, giving a lengthy explanation.

On March 6, 2012, the court sustained the amended petition and assumed jurisdiction over Marquis. As to the disposition, the Agency recommended that Marquis be returned to his parents on the condition that a family maintenance plan was in place beforehand. The court accepted the recommendation and imposed several terms and conditions.

---

[3] Marquis's appellate attorney likewise joins in the parents' position.

## DISCUSSION

## I

### Motion to Dismiss

■ Preliminarily, we dispose of the Agency's motion to dismiss the appeals as moot since on September 5, 2012, the juvenile court terminated dependency jurisdiction over Marquis.[4] " 'As a general rule, "an appeal presenting only abstract or academic questions is subject to dismissal as moot." [Citation.]' [Citation.] However, where a judgment dismissing the dependency action is challenged on appeal the case 'is not moot *if* the purported error is of such magnitude as to infect the outcome of [subsequent proceedings] *or* where the alleged defect undermines the juvenile court's initial jurisdictional finding.' " (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547 [30 Cal.Rptr.2d 10]; see *In re Kristin B.* (1986) 187 Cal.App.3d 596, 605 [232 Cal.Rptr. 36].) The "refusal to address [asserted] jurisdictional errors on appeal by declaring the case moot has the undesirable result of insulating erroneous or arbitrary rulings from review." (*In re Joshua C., supra,* at p. 1548.) Further, the parents raise a statutory interpretation issue that could arise again and evade review. (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 245, fn. 2 [10 Cal.Rptr.3d 185].) Thus, we deny the motion.

## II

### Statutory Interpretation

■ " ' " 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." [Citation.] " 'The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction.' " [Citation.] "The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." ' " (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 [142 Cal.Rptr.3d 792].)

Here, the juvenile court assumed jurisdiction under subdivision (a) of section 300, which provides the court may adjudge a child a dependent if the "child has suffered, or there is a substantial risk that the child will suffer,

---

[4] We grant the Agency's unopposed motion to augment the record with juvenile court records generated after the jurisdiction hearing. (Evid. Code, § 452, subd. (d).)

serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child *or the child's siblings*, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a), italics added.)

The parents assert that since L.M. and T.S. are not Marquis's siblings, the statute is inapplicable and may not serve as a basis of jurisdiction. They claim that under the plain language of section 300, subdivision (a), there are only three scenarios under which the court may exercise jurisdiction—those expressly spelled out in the second sentence of the statute.

■ "The interpretation of a statute is a question of law we review independently." (*In re Lana S., supra*, 207 Cal.App.4th at p. 108.) " 'The rules governing statutory construction are well established. Our objective is to ascertain and effectuate legislative intent. [Citations.]' [Citation.] In determining legislative intent, we first look to the statutory language itself. [Citation.] 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' [Citation.]

■ " 'The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]' [Citation.] Thus, 'every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect.' " (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 849–850 [60 Cal.Rptr.3d 486].) "Given the complexity of the statutory scheme governing dependency, a single provision 'cannot properly be understood except in the context of the entire dependency process of which it is part.' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1235 [91 Cal.Rptr.3d 140, 203 P.3d 454].)

■ We do not read section 300, subdivision (a), as prohibiting the exercise of jurisdiction in situations other than those specified in the second sentence of the statute. In our view, the permissive language of the second sentence merely sets forth scenarios in which the statute may apply. As the Agency points out, "the Legislature could not be expected to foresee and codify every mode of physical abuse which may place a child at substantive risk of physical harm by an abusive parent."

■ Indeed, section 355.1, subdivision (b) provides, "Proof that either parent . . . who has the care or custody of a minor who is the subject of a

petition filed under Section 300 has physically abused . . . *another minor shall be admissible in evidence.*" (Italics added.) In *In re Y.G.* (2009) 175 Cal.App.4th 109, 116 [95 Cal.Rptr.3d 532], which pertains to subdivision (b) of section 300, the court observed: "Depending on the circumstances, a parent's abuse of an unrelated child may well tend to prove that the parent suffers from characteristics that also place the parent's child at substantial risk of similar abuse . . . ." This reasoning applies even more strongly to abuse of *related* minors living in the home. We agree that the court is vested with broad discretion in determining whether "there is a substantial risk that the child will suffer . . . serious physical harm inflicted nonaccidentally . . . ." (§ 300, subd. (a).) For instance, in *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–599 [108 Cal.Rptr.3d 885], the appellate court held that subdivision (a) of section 300 was applicable based on the child's exposure to domestic violence, a context not mentioned in the second sentence of the statute.

The discussion, *ante*, is dispositive, but even if the language of section 300, subdivision (a), arguably supported the parents' position, we would not interpret it in the manner they do. A statute " 'should not be given a literal meaning if to do so would create unintended, absurd consequences. Instead, "intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment." ' " (*In re Lana S., supra*, 207 Cal.App.4th at p. 108.)

"The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof . . . ." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826]; see § 300.2 ["purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm"].) It would be absurd to interpret section 300, subdivision (a), to prohibit the court as a matter of law from exercising jurisdiction over a child whose parents had severely physically abused their own grandchildren who were also living in the home and under their exclusive care.

## III

### *Sufficiency of the Evidence*

Alternatively, the parents contend the jurisdictional finding lacks evidentiary support. "We review the entire record to determine whether substantial evidence supports the court's finding. We resolve all conflicts, and draw all reasonable inferences in support of the findings. [Citation.] 'We do not

reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders.' " (*In re Lana S., supra*, 207 Cal.App.4th at p. 103.)

" 'Substantial evidence does not mean *any* evidence; it must be " ' "substantial" proof of the essentials which the law requires.' " [Citation.] "To be sufficient to sustain a juvenile dependency petition[,] the evidence must be ' "reasonable, credible, and of solid value" ' such that the court reasonably could find the child to be a dependent of the court by clear and convincing evidence." [Citation.] A mere "scintilla" of evidence is not enough.' " (*In re Lana S., supra*, 207 Cal.App.4th at p. 103.)

The evidence summarized in the factual portion of this opinion overwhelmingly supports the court's jurisdictional finding. The parents repeatedly refer to the lack of evidence that Marquis suffered physical abuse, but that is unavailing as the petition was not based on that ground. Rather, it was based exclusively on the risk of future harm to Marquis given his parents' severe physical abuse of their grandchildren. Darnell concedes the parents' "actions against their grandchildren . . . were reprehensible and inconsistent with their role [as] stand-in parents for those children."

The court gave a thoughtful and thorough explanation for its ruling. The court explained that over a lengthy period Marquis had witnessed his parents' abuse of L.M. and T.S., and the parents' threats that they should not report the abuse. Marquis was encouraged at least once to beat L.M. himself and he had engaged in beating T.S. The court added: "One of the court's concerns and one of the bases for taking jurisdiction in this case, was the court's very significant concerns that . . . some of the triggers that caused the [parents] to abuse [L.M.] and [T.S.] included daily activities, such as completing chores, not completing chores, listening or being responsive to the [parents], and sometimes just what mood they were in; and I consider that a particularly concerning situation for a child who is going to be finding himself in the home with the two of them." The court reasonably found, "This is an exceedingly dangerous situation" without an exercise of jurisdiction and oversight by the Agency.[5]

---

[5] Since this is not a sexual abuse case, the parents' reliance on *In re Maria R.* (2010) 185 Cal.App.4th 48 [109 Cal.Rptr.3d 882] (*Maria*), for the proposition that the physical abuse of some children in the home is not evidence that another child is at risk of abuse, is misplaced. In *Maria*, this court concluded that brothers of molested girls may be harmed by the fact of molestation occurring in the family, for purposes of jurisdiction under section 300, subdivision (j), but "in the absence of evidence demonstrating that the perpetrator of the abuse may have an interest in sexually abusing male children," there was no risk of sexual abuse within the meaning of section 300, subdivision (d). (*Maria*, at p. 67.) There is a split of authority on the issue (see *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 [51 Cal.Rptr.3d 448]; *In re Andy G.*

## DISPOSITION

The order is affirmed.

McDonald, J., and Irion, J., concurred.

A petition for a rehearing was denied January 22, 2013, and appellants' petitions for review by the Supreme Court were denied March 27, 2013, S208678.

.

.

---

(2010) 183 Cal.App.4th 1405, 1414 [107 Cal.Rptr.3d 923]), and the California Supreme Court has granted review of an opinion dealing with the issue (*In re I.J.* (2012) 207 Cal.App.4th 1351 [144 Cal.Rptr.3d 503], review granted Sept. 19, 2012, S204622).