Filed 3/16/26  In re S.P. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br> Petitioner and Respondent, <br> v. <br><br> S.P., <br> Objector and Appellant. | A173648 <br><br> (City & County of San Francisco Super. Ct. No. JD24-3004) |

S.P. (mother) appeals from a dependency court's jurisdictional ruling in a case involving her young son (the child). Mother contends that the record contains insufficient evidence of a substantial risk that her son would suffer serious physical harm in her care.  We affirm.

### BACKGROUND

#### A.

The San Francisco County Human Services Agency filed this dependency petition in January 2024, alleging that there was a substantial risk that the then three-year-old child would suffer serious physical harm based on mother's failure or

inability to adequately protect him. (See Welf. & Inst. Code, § 300, subd. (b)(1)(A).)[1] In support of the petition, the Agency alleged that the child was at risk in light of his teenaged half-sibling N.'s report that mother "has kicked, slapped, and punched [her] on her body in the recent past." The Agency also alleged that "[t]he family has an extensive child welfare history with 29 prior referrals with concerns about general neglect, emotional abuse[,] and physical abuse." The 29 previous child welfare referrals did not result in any cases.[2] The Agency did not detain the child, and he remained in mother's custody during the proceedings.

N. recounted that in June or July of 2023, mother had slapped, punched, kicked, and degraded her during an argument over N.'s possession of a cell phone which mother had not authorized. Although no injuries were reported, N. called 911 and the police took her to a home called Huckleberry House with mother's permission. N. subsequently refused to return home, ran away to live with relatives, and also slept out of doors for some time.

When she was interviewed by a social worker in December 2023, N. did not have any current injuries but she stated that mother has "has hit, kicked, slapped, and punched her on her body in the recent past." Mother has verbally degraded her, called her a "Bi**h" and threatened to make her life "a living hell." Mother has also destroyed N.'s room by breaking and throwing out her things, forcing N. to clean up her room within 10 minutes to avoid further punishment. Although N. and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The petition also contained two other allegations concerning sexual abuse of N. by her maternal grandfather and domestic violence between mother and the child's father. Because the dependency court struck those allegations, they are not relevant to this appeal.

mother had previously participated in family therapy, mother would "always punish her after[ward] . . . if [N.] said anything negative about mom in the . . . sessions." Mother's former therapist reported that "mom's behavior can be controlling and harmful to [N.]. Mom's need for control can cause her to act in extreme ways." In January of 2024, the Agency removed N. from mother's home and initiated a separate dependency case for N.

The Agency also received reports that mother had physically abused another half-sibling, C., who was about eight years old at the outset of the dependency petition.[3] The child's father, who is also C.'s father and mother's husband, reported that "he has witnessed [mother] being verbally and physically aggressive to both [N.] and [C.]." He recounted that when C. was six years old, there were "instances" in which mother had "smack[ed] her and yell[ed] at her" for leaving fingerprints on the car after it had just been washed. In addition, C. disclosed that mother had slapped her across the face, threatened to make her eat a packet of hot sauce, and denied her access to the bathroom, which caused her to urinate on the floor. According to the child's paternal grandmother, N. had reported to her that mother "has been abusive to [C.] by slapping her and making her take food she did not eat out of the trash and . . . forc[ing] [her] to eat it." Mother also threw away "all of her toys." C. was afraid of mother.

As for the child, the Agency's investigation did not document signs that he was being physically abused. At a home visit in December 2023, a social worker noted no visible marks or bruises on the child's body. When the social worker asked the

---

[3] According to the disposition report, C. was eight in February of 2024. Father and C. moved out of mother's home in September of 2022, when C. would have been approximately six; most likely these incidents occurred when C. was still living with mother.

child if he felt safe in mother's home, he shook his head no. However, the child started laughing immediately afterward. The detention report observed that the child "appears well cared for, but further assessment is needed to determine what level of intervention, if any, is needed to ensure his safety and well-being."

During a home visit in February of 2024, social worker Donita Carter had safety concerns when mother allowed the child to walk along a bench by a window, when the bench was covered with food, papers, and other items. The child "kept slipping," which made Carter "really afraid" for his safety. When Carter flagged the safety issue, mother was not concerned and "seemed comfortable with his behavior," stating that there was no glass and he knew the area well.

Subsequently, social workers had limited access to the child. An Agency report observed that mother seemed to stop cooperating because of a disagreement with the Agency, stating "it is clear that once she is told NO for any reason or [is] not being agreed with, she lashes out." Mother did not fully comply with father's visitation schedule, and she failed to respond to communications concerning the Agency's attempts to arrange monthly visits to check on the child, so the social worker had to conduct a search to locate the child's daycare.

Social workers were able to see the child briefly at daycare on approximately five occasions in 2024 (plus one visit at a social worker's office). The social workers noted during such visits that the child "looked well," had no marks or bruises reported by the daycare provider, and was well groomed and dressed appropriately. The child did not speak during the visits. The child's daycare provider, who had cared for him five days a week since May 2021, had no concerns about his physical well-being and had never seen any marks or bruises on him. The child had never reported to the daycare provider that his mother hit or

4

abused him. According to the daycare provider, the child is "very happy" and "seems happy" whenever mother came to pick him up. The daycare provider had no concerns about mother being violent or abusive.

Agency reports from December 2024 and May 2025 stated that there are "no concerns regarding [the child's] physical care." The Agency recommended, however, that mother engage in individual therapy "to change her patterns and behaviors around her need for control" and "develop strategies to manage her mental health."

Prior to the dependency court's jurisdictional ruling, Carter testified that mother's treatment of N. raised concerns about mother's ability to safely parent the child, because "if Mom gets that angry, would she be so angry [as] to use physical discipline with" the child? Carter described mother's actions as "controlling," citing her efforts to obtain restraining orders against multiple relatives. Carter further explained: "From what I found, . . . , if it wasn't [mother's] way, it was no way. She got really, really upset if anything happened that would prevent her from being heard [or] seen." According to Carter, mother's failure to be accountable for her own actions also raised concerns.

Social worker Pernita Brown, who was qualified as an expert in child welfare, testified that mother "wasn't able to control her emotions with [N.]." In her opinion mother "has a need for control . . . that . . . is unhealthy." Brown testified that mother's physical abuse of N. and her "need for control" raised concerns about the child's "emotional well-being." The child's physical appearance during welfare checks never raised any concerns about his safety. But the Agency's limited access to the child meant that the Agency did not have enough information to adequately assess his safety in mother's home.

In her testimony, Mother did not deny that she had punched, kicked, or slapped N., but explained that N.'s

5

possession of a cell phone concerned her because N. had had "issues" using the cell phone inappropriately, such as by sending nude photos or interacting with older men. Mother also testified that before the instant dependency case, there had never been any issues raised about her parenting of C. as a step-parent. Mother did not deny, however, the reports about her mistreatment of C. Mother testified that she had never punched, kicked, or slapped the child, nor had she ever verbally degraded him. No one had ever expressed concerns to her about the child's physical safety or emotional safety in her care. Mother was engaged in therapy and had never been diagnosed with any mental disorders.

## B.

In finding jurisdiction at a June 2025 hearing, the dependency court relied on mother's altercation with N., noting the Agency's concern that "if [mother] gets that angry with [N.] that she might also get that angry and use physical discipline with [the child] too."[4] The court "acknowledge[d] the children are different ages, but teenagers can be frustrating and button-pushing in the same way toddlers can." The court also relied on the evidence that mother was "physically abusive" to C., "a child of a similar age." In addition, the court cited the evidence that mother's conduct posed a safety risk for the child in the incident in which Carter had observed him walking on "a ledge by [a] window." Further, the court found that the evidence established that mother had a "controlling nature" and "anger." The court noted that mother's "pattern of filing restraining orders against people that [she] disagrees with" supported a conclusion that she may "act in a punitive and punishing nature towards [the child],

___

[4] The court also took judicial notice of the findings in N.'s separate dependency case against mother, in which the court found jurisdiction based on the same allegations concerning mother's conduct toward N.

6

and he is a young child who by all accounts is relatively shy and a young man of few words, so the Court does have a concern that he is not able to speak up for himself and advocate for himself." Taking all the evidence together, the court found that there was a substantial risk that the child would suffer serious physical harm or illness as a result of his mother's conduct, including her failure to protect him. The court sustained the allegations in the dependency petition under section 300, subdivision (b)(1)(A), concerning mother's abuse of N. and the family's extensive child welfare history.

With respect to disposition, the court declared a dependency, continued the child in mother's custody, and ordered family maintenance services for mother, including individual therapy. The court also ordered that the results of the psychological evaluation ordered in N.'s case be shared for purposes of the child's case. In addition, the court found that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) applied to the child based on father's membership in a tribe.

## DISCUSSION

Mother contends that substantial evidence does not support the dependency court's jurisdictional ruling under section 300, subdivision (b)(1)(A). We disagree.

Section 300, subdivision (b)(1)(A), provides for dependency jurisdiction when a child "has suffered, or [when] there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" the parent's "failure or inability . . . to adequately supervise or protect the child." To establish jurisdiction, the question is whether the statutory criteria were met, by a preponderance of the evidence, based on the facts in existence at the time of the jurisdiction hearing. (See *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1318.) In reviewing the jurisdictional ruling for substantial evidence, we must draw every reasonable inference and resolve all conflicts in favor of the

7

dependency's court's ruling. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

A parent's physical abuse of another minor, particularly one related to the child who is the subject of the dependency petition, may support a conclusion that the parent has characteristics that place the child at substantial risk of similar abuse. (See *In re Marquis H.* (2013) 212 Cal.App.4th 718, 725-726; *In re Y.G.* (2009) 175 Cal.App.4th 109, 115-116 (*Y.G.*); see also § 355.1, subd. (b) ["Proof that either parent, the guardian, or other person who has the care or custody of a minor who is the subject of a petition filed under Section 300 has physically abused, neglected, or cruelly treated another minor shall be admissible in evidence."].) Consideration of the parent's past abuse of other children reflects the principle that a parent's prior conduct may contribute to a current risk when there is a reason for believing that the conduct will continue. (*Y.G.*, at p. 116; cf. § 300, subd. (j) [providing an additional ground for dependency jurisdiction where "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."].) In assessing the likelihood that the parent's abuse of another minor is probative of a current risk, the court might consider when the earlier abuse occurred, whether the other minor is of similar age to the child named in the dependency petition, and the reasons for the abuse. (See *Y.G.*, at p. 116.)

In *In re D.B.* (2018) 26 Cal.App.5th 320, 330 (*D.B.*), for example, the court considered a case in which the parents routinely hit their six-year-old son with a belt, injuring him, but there was no evidence that the parents had ever physically harmed his younger brother, a toddler. (*Id*. at pp. 330-331.) The court concluded that the evidence was sufficient to support dependency jurisdiction because, in light of the sibling's young

8

age and the parents' physical abuse of the older son, "even a single episode of corporal punishment could have devastating consequences" on the toddler's physical safety. (*Id*. at pp. 330-332.)

Here, although there is no evidence that mother ever physically abused the child, the record did contain evidence that she assaulted and abused the child's half-siblings. Mother punched, kicked, and slapped N. when N. was 14. Mother also slapped and "smack[ed]" C. on multiple occasions when she was approximately six or younger, denied her access to the bathroom, and forced her to eat food out of the trash. According to the child's paternal grandmother, mother's "behaviors and abuse of the children ha[ve] been ongoing for years." As a result of mother's abuse, C. was afraid of her and N. refused to return home. Mother never denied striking or kicking N. and C. in her testimony, nor has she attempted to justify her behavior as reasonable physical discipline.

Mother's physical abuse of N. and C. created a substantial risk that she would inflict similar physical abuse on the child, who was only four at the time of the jurisdictional ruling. That mother abused both N. and C. despite the difference in their ages supports a conclusion that the risk of harm was not limited based on age. And there can be no doubt that punching, kicking, or hitting a four-year-old can result in "serious physical harm." (§ 300, subd. (b)(1)(A); cf. *D.B.*, *supra*, 26 Cal.App.5th at p. 332.)

The record also supports the conclusion that mother's abusive conduct was likely to reoccur. Although the abuse of N. and C. happened approximately two or more years before the jurisdictional ruling, by which point neither N. nor C. were residing with mother, there was evidence that the abuse had been "ongoing for years." Evidence that the abuse was caused or exacerbated by mother's tendency to engage in controlling behaviors also supports a concern that the risk of abuse was

9

ongoing. Mother's former therapist opined that mother's desire for control caused her to act in "extreme ways" harmful to her children. Mother's controlling behavior continued during the dependency petition, including seeking restraining orders against multiple family members, refusing to allow the agency access to the child, and failing to make the child available for visitation with his father in some instances. As the social workers observed, mother had a tendency to lash out or engage in punitive behavior when she did not get her way. In addition, there was evidence that mother failed to accept responsibility for her abuse of the child's half-siblings, which increased the likelihood that she would repeat or even escalate her abusive behavior in the future as new parenting challenges related to the child inevitably arise.

In sum, combined with her physical abuse of the child's half-siblings, mother's controlling tendencies and inability to control her emotions support the dependency court's conclusion that there is a substantial and continuing risk that she will subject the child to serious physical harm or illness. (Cf. *In re T.R.* (2023) 87 Cal.App.5th 1140, 1144, 1150-1151 [evidence that parent had choked his 13-year-old daughter once, pulled his 10-year-old daughter by her hair, and hit them and his seven and five year-old daughters with a belt for punishment demonstrated the children were in danger of suffering serious physical harm]; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438-439 [evidence that a mother had hit her three-year-old son and eight-year-old daughter with a belt on multiple occasions supported a conclusion that "without intervention, the severity of punishment could escalate even further" and place both children at risk of serious physical harm, where the mother had minimized her conduct].)

## DISPOSITION

The dependency court's jurisdictional order is affirmed.

10

                                                    BURNS, J.

WE CONCUR:


JACKSON, P. J.
SIMONS, J.

*In re S.P. / San Francisco Human Services Agency v. S.P.* (A173648)

11