Filed 11/25/13  In re N.H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re N.H., a Person Coming Under the Juvenile Court Law. | B243685 (Los Angeles County Super. Ct. No. CK90651) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANDREA M. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steven R. Klaif, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Andrea M. (Mother).

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant James H. (Father).

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Appellants Andrea M. and James H. appeal from the juvenile court's jurisdictional findings and disposition order entered on August 24, 2012, adjudging their daughter, N.H., a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] and ordering her removal from Andrea's custody. James joins in Andrea's appeal and separately challenges the juvenile court's disposition order requiring him to participate in parenting education classes and individual counseling pursuant to section 362. This case arises out of the tragic injuries suffered by N.H's one-year-old cousin, Kiara, while N.H. and Kiara were in Andrea's care. Although N.H. did not suffer the injuries giving rise to the present action, the Los Angeles County Department of Children and Family Services ("DCFS" or "respondent") filed a section 300 petition on her behalf due to Andrea's treatment of Kiara.

On appeal, appellants argue the juvenile court erred in adjudging N.H. a dependent of the court because she was neither injured, nor the sibling of the injured child. Further, James separately argues the juvenile court erred in ordering him to attend parenting education classes and individual counseling because he played no role in causing Kiara's injuries. For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### I. Kiara's Injuries and N.H.'s Dependency Proceedings

On October 20, 2011, one-year-old Kiara suffered a seizure while in the care of her babysitter, Andrea. 9-1-1 was called and the paramedics took an unresponsive Kiara to the emergency room at the U.C.L.A. Medical Center. At the hospital, Kiara was examined by Dr. Claudia Wang, the Medical Director of U.C.L.A.'s Suspected Child Abuse and Neglect Team. Dr. Wang determined that Kiara's seizure was the result of significant head trauma, which included a complex skull fracture, subdural hematoma, bleeding in the brain, and retinal hemorrhages.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

That same day, DCFS initiated an investigation into Kiara's family and filed a dependency petition on behalf of Kiara and her older sister.[2] DCFS's detention report contained the following information regarding the incident. On the morning of October 20, 2011, Kiara's grandmother, Patricia W., dropped Kiara off at Andrea's home. Around lunchtime, Kiara woke up from a nap and soon passed out. After Andrea called 9-1-1 and the paramedics arrived, Kiara suffered a seizure in the ambulance.[3] At the hospital, Kiara was placed on a breathing machine. According to investigators, Andrea denied that Kiara hit her head while in Andrea's care. Kiara's mother, Tischa R., could provide no explanation for Kiara's injuries.

On November 2, 2011, following an assessment by Children Social Worker ("CSW") Eboni Crowe, Andrea's one-year-old daughter, N.H., was ordered detained and placed with her maternal great-aunt, Bridgett M. CSW Crowe cited a need to ensure N.H.'s safety due to the following factors: (1) the seriousness of Kiara's injuries, which likely occurred while in Andrea's care, (2) Andrea and James's refusal to cooperate with law enforcement, and (3) Andrea and James's alleged history of domestic violence.

On November 7, 2011, DCFS filed a dependency petition, alleging that N.H. was at a substantial risk of harm due to Andrea's treatment of Kiara, placing her within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a) and (b). DCFS alleged that N.H. faced a substantial risk of harm because Kiara suffered serious injuries while in Andrea's care, and Andrea would not attempt to explain Kiara's injuries. That same day, the juvenile court conducted a detention hearing. The court found that DCFS made a prima facie showing that N.H. was a minor described by section 300, subdivisions (a) and (b), and ordered N.H. temporarily removed from the custody of her parents pending disposition of the case.

---

[2]     DCFS's petition on Kiara's behalf resulted in another dependency case involving Kiara's mother and father. That case was ultimately dismissed in December of 2011.

[3]     The reports and testimony from N.H.'s dependency proceedings indicate that Kiara suffered the seizure while in Andrea's care, before the paramedics arrived.

On December 6, 2011, DCFS filed a jurisdiction/disposition report which included statements from several people, including: Andrea; Tischa; Kiara's father; N.H.'s maternal great-great-grandmother, Freddie W.; N.H.'s paternal grandmother, Patricia W.; Detective Benjamin of the Los Angeles Police Department's Abused Child Unit; and Dr. Claudia Wang. The report indicated that Kiara had been a healthy and happy baby until the middle of September of 2011, when she began to suffer from recurring bouts with vomiting and diarrhea. Around the same time, Kiara began to undergo a noticeable mood change. The report also indicated that Tischa fully cooperated with law enforcement's investigation, while Andrea refused to be interviewed by, or make a statement to, law enforcement.

The juvenile court conducted the adjudication hearing over the span of two months, on June 26-27, 2012, and August 23-24, 2012. The court heard testimony from seven witnesses,[4] and admitted eight exhibits into evidence.

### Dr. Maria Boechat

Dr. Maria Boechat, the Chief of Pediatric Imaging at U.C.L.A. Children's Hospital, testified first. The juvenile court designated Dr. Boechat as an expert in pediatric radiology.

Dr. Boechat testified primarily about Kiara's rib injuries. Dr. Boechat stated that Kiara had first visited the hospital because of vomiting in September of 2011. According to Dr. Boechat, x-rays of Kiara's chest were taken during that visit, but they showed no signs of trauma. However, when Kiara returned to the hospital following her seizure on October 20, 2011, a new set of x-rays revealed that a number of Kiara's ribs were healing from fractures. Although Dr. Boechat could not determine the exact time when Kiara suffered the rib fractures, she estimated that they could have occurred shortly before Kiara was admitted to the hospital for vomiting in September of 2011. According to her, the type of rib fractures Kiara suffered are usually caused by squeezing.

---

[4]     Although Andrea took the stand, she invoked her Fifth Amendment right against self-incrimination and did not testify.

*Dr. Claudia Wang*

Dr. Claudia Wang, the Medical Director of U.C.L.A's Suspected Child Abuse and Neglect Team, testified next. Dr. Wang has served as Medical Director for 20 years. As part of her duties, Dr. Wang oversees all cases of child endangerment that come before the U.C.L.A. Medical Center, and she evaluates and examines patients in the Pediatric Intensive Care Unit and Emergency Department. The juvenile court designated Dr. Wang as an expert in pediatric child abuse issues.

Dr. Wang first contacted Kiara on October 20, 2011, when Kiara was brought to the hospital after she suffered a seizure while in Andrea's care. During Dr. Wang's examination of Kiara, she discovered that Kiara had suffered severe head injuries, including a complex skull fracture, subdural hematoma, bleeding in the brain, and retinal hemorrhages in both eyes.

In regard to the skull fracture, she testified that it was complex and crossed several bones, indicating that it could not have been caused by a simple fall. Therefore, she concluded that an incident in which Kiara fell off of a bed while playing with her mother one month prior could not have been the cause of her skull injury. Although she testified that such complex fractures can occur as the result of an accident involving significant impact – i.e., a car accident – she concluded that Kiara's skull injury was not the result of such an accident because no members of her family had reported such an incident. In accordance with Dr. Boechat's opinion, Dr. Wang testified that Kiara's skull fracture likely resulted from an impact against a non-forgiving surface. Dr. Wang opined that because all of Kiara's head injuries were in the same location, they likely were the result of the same traumatic incident. Further, she testified that Kiara's injuries were acute, meaning that they occurred shortly before her hospitalization, because the soft tissue above her skull was still swollen when she was hospitalized.

Dr. Wang also testified about Kiara's behavior on the morning of October 20, 2011, and how that information led to her conclusion that Kiara was abused while in Andrea's care. Reflecting on her interview with Kiara's mother, Dr. Wang testified that Kiara was alert before she was taken to Andrea's home, feeding herself cereal and

drinking from a bottle. On the way to Andrea's home, Kiara was smiling and happy. In Dr. Wang's opinion, a child exhibiting Kiara's alertness and happiness would not be suffering from the severe head injuries that were apparent when she arrived at the hospital later that day. She described her thought process as follows: "I am looking at when she looks great for a period of time, not just a minute here or a minute there or a few seconds. For one and a half, two hours, she is looking normal at home and is leaving happy and smiling. That really says that that is a child where I can't imagine if the head had been injured – kids tell you when they don't feel well. After an injury like that, they are not going to feel well. After an injury like that, they are not going to be happily smiling and playing. They might not be too happy, responsive, sort of groggy or sleepy or maybe crying or fussy. But to really look A-plus, it is really tough." Based on this observation, Dr. Wang concluded that Kiara's injuries were the result of child abuse. She ruled out Kiara's mother as the cause of the injuries because of Kiara's jovial behavior prior to her being dropped off at Andrea's apartment on the morning of October 20, 2011.

### *Tischa R.*

Kiara's mother, Tischa, testified on the second day of the adjudication hearing. She stated that Andrea began babysitting Kiara on August 31, 2011. Andrea watched Kiara on weekdays, from 7:30 in the morning until 2:30 in the afternoon, while Tischa was at work.

Throughout the weeks leading up to October 20, 2011, Kiara had been sick and clingy. Tischa testified that due to a stomach virus, Kiara was admitted to the hospital for three days on October 12, 2011. During that hospital visit, Kiara was prescribed antibiotics for a suspected urinary tract infection. However, she did not finish her prescription because the medication made her vomit. According to Tischa, Kiara stopped taking the medication on October 17, 2011, and did not vomit again until October 20, 2011, at Andrea's home.

Tischa stated that the only other people who watched Kiara during the week leading up to October 20, 2011, were Kiara's grandmother, Patricia W., who would drive

6

Kiara to Andrea's home, and Kiara's great aunt, Yvonne, who watched Kiara on two occasions. Tischa expressed no concern about Patricia's or Yvonne's handling of Kiara.

Tischa testified that a minor incident involving Andrea and Kiara occurred near the end of September of 2011, when Tischa noticed a scratch on Kiara's stomach. Tischa was concerned about this incident because Andrea initially lied about the cause of the scratch. When first questioned about it, Andrea told Tischa that Kiara had scratched herself. However, when Tischa expressed doubt about Kiara scratching herself, Andrea told her that N.H. had in fact scratched Kiara.

### Patricia W.

Kiara's grandmother, Patricia W., testified next. Patricia testified that she drove Kiara to Andrea's home on the morning of October 20, 2011. Patricia stated that although there was nothing particularly remarkable about Kiara's behavior that morning, Kiara was less energetic than usual and wanted to be held. According to Patricia, Kiara cried when she was dropped off at Andrea's apartment. However, Kiara usually cried when Patricia left her with a babysitter because Kiara was not used to being around other people.

### James H.

N.H.'s father, James H., testified next. He testified that he had lived with Andrea in their apartment for about two or three years. He stated that he saw Kiara in Andrea's home on the morning she suffered her seizure, but that he did not handle her that day. Throughout his testimony, he made it clear that he was only concerned about handling his chronic stomach problems, and that he never helped care for N.H. or Kiara. Although he heard Kiara cry out on the morning of October 20, 2011, he did not check on her because he was in the bathroom dealing with stomach issues. He could not recall who called the ambulance after Kiara suffered her seizure. He testified that he never saw Andrea get angry with Kiara.

### Dr. Charles Niesen

Dr. Charles Niesen, a child neurologist, testified next as Andrea's first witness. Following a voir dire examination of Dr. Niesen, in which counsel for DCFS questioned

him about his current status as a decertified child neurologist, the juvenile court designated Dr. Niesen as an expert in pediatric neurology.

Dr. Niesen testified about his opinion regarding the cause of Kiara's injuries. Although Dr. Niesen reviewed Kiara's medical records from U.C.L.A. Medical Center, he never physically examined Kiara prior to testifying at the adjudication hearing. He agreed with Dr. Wang's opinion that Kiara had suffered a skull fracture, subdural hematoma, and bleeding in the brain, but he did not believe Kiara had suffered retinal hemorrhages in both eyes; he believed that Kiara had suffered a retinal hemorrhage in only her left eye. In his opinion, Kiara's injuries could have occurred within a much broader timeframe than that testified to by Dr. Wang. He believed the injuries could have been sustained anywhere from a few minutes to a couple of days before Kiara suffered the seizure.

During the hearing, Dr. Niesen reviewed the C.T. scan of Kiara's brain from October 21, 2011. He characterized the swelling on the left side of Kiara's brain as a minor abnormality, stating "[t]his is almost a normal looking picture of the brain except for the fact there is some soft tissue swelling here in the left side of the brain where there was an injury." Dr. Niesen identified two additional "abnormalities," including Kiara's subdural hematoma and a more significant swelling on the left side of Kiara's brain, which closed off Kiara's left lateral ventricle. In his opinion, these injuries were acute, but he believed they would have developed at different times following the impact that caused them. He stated the bleeding associated with the hematoma would have occurred shortly after the impact, and the swelling on the left side of Kiara's brain would have developed anywhere between an hour to two days after the impact.

Dr. Niesen opined that Kiara's seizures were the result of the brain swelling. When asked about the cause of the brain swelling, he believed it was the result of an accidental injury. However, on cross-examination he testified that the type of injuries Kiara suffered could be caused by a nonaccidental impact, and he stated that he was ultimately unsure whether Kiara's injuries were accidental.

8

*Freddie W.*

Kiara's maternal great-great-grandmother, Freddie W., was the last witness to testify at the adjudication hearing. She testified that she lived in the apartment below Andrea and James, and would often see Kiara when she was at Andrea's apartment. Freddie was concerned about Kiara's health because Kiara would cry and eat poorly when she was at Andrea's apartment. In regard to October 20, 2011, Freddie stated that Kiara was very fussy and threw up several times during the morning. However, Freddie left the apartment complex before Kiara suffered the seizure. In her opinion, Andrea was a good mother and she had no concerns about Andrea's ability to care for N.H. or Kiara.

## II. The Juvenile Court's Jurisdictional Findings and Disposition

The juvenile court sustained N.H.'s dependency petition, finding by a preponderance of the evidence that N.H. was a child described by section 300, subdivisions (a) and (b). The court made the following finding: "On 10/20/11, the child, [N.H.'s] one-year-old maternal cousin, Kiara . . . was hospitalized and found to be suffering from a detrimental and endangering condition consisting of a subdural hematoma, swelling to [her] brain and skull fractures. [Kiara] sustained retinal hemorrhages to [her] left eye. [Kiara] sustained healing fractures of [her] sixth, seventh, eighth and ninth left ribs. [N.H.'s mother], Andrea Mitchell, gave no explanation of the manner in which [Kiara] sustained her injuries. [Kiara's] injuries are consistent with inflicted trauma. Such injuries would not ordinarily occur except as a result of deliberate, unreasonable, and neglectful acts by [Andrea], who had care and supervision of [Kiara] at the time [she] sustained [her] head and rib injuries. Such deliberate, unreasonable, and neglectful acts on the part of [Andrea] to [Kiara] endangers [N.H.'s] physical health, safety, and well-being, creates a detrimental home environment, and places [N.H.] at risk of physical harm, damage, and danger."

The juvenile court rejected Andrea's argument that Patricia W.'s testimony that Kiara was not acting like herself before she was dropped off at Andrea's on October 20 undermined the court's finding. The court stated, "[w]ith the description of this injury, the severity of this injury as described by Dr. Wang, it is not the sort of thing that, yes,

the edema might occur later. The seizure activity. This child would be screaming. This child would be in severe pain. This child would be out of it. More than just 'not herself.' She had a skull fracture that went to multiple areas of her skull . . . I think if that injury had occurred earlier, she would have been far more than 'not quite herself.'"

After making its jurisdictional findings, the juvenile court issued its disposition order. The court ordered N.H. removed from Andrea's home pursuant to section 361, subdivision (c), finding by clear and convincing evidence that N.H. would face a substantial risk to her physical health, safety, protection and physical or emotional well-being if she were to remain in Andrea's custody. The court found no reasonable means by which N.H.'s health could be protected without removal, finding that reasonable efforts were made to prevent or eliminate the need for N.H.'s removal. The court transferred N.H.'s care, custody, and control to DCFS, and ordered N.H. placed with her father, James, at N.H.'s paternal grandmother's home.

The juvenile court ordered family reunification services for Andrea and family maintenance services for James. The court granted Andrea a minimum of three monitored visitations per week, with DCFS having discretion to liberalize the visits. The court ordered Andrea to participate in parenting education classes and individual counseling. The court rejected Andrea's request for N.H. to remain in Andrea's home.

In regard to the order requiring James to participate in parenting education classes and individual counseling, the court made the following finding: "[T]here are issues in the dynamic with the family relationship now. And that dynamic is going to be severely tested. So I am ordering counseling." James objected to the order. In overruling the objection, the juvenile court further explained its order, stating "I think [James] is non-offending, but he appears to be taking a very passive role in all of this, and he did not appear to be accepting of the responsibility of the mother. So that is why I am ordering counseling over your objection." This joint appeal followed.

*DISCUSSION*

*Mother's Issues on Appeal*

*I. Section 300, Subdivision (a), Properly Applies When A Parent Harms Another Child Who Is Not the Sibling of and Does Not Reside With that Parent's Child*

Andrea argues that section 300, subdivision (a), does not support a juvenile court's exercise of jurisdiction over a child who was neither the abused child, nor the sibling of the abused child.[5] She contends that *In re Marquis H.* (2013) 212 Cal.App.4th 718, was incorrectly decided and does not justify the juvenile court's exercise of jurisdiction over N.H. Alternatively, she argues that even if *In re Marquis H.* was correctly decided, the facts of that case are distinguishable from those in the present action. We disagree.

*a. Standard of Review*

In her challenge to the juvenile court's adjudication of N.H. as a dependent of the court under section 300, subdivision (a), Andrea raises a question of statutory interpretation. "[T]he proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we review de novo." (*In re R.C.* (2011) 196 Cal.App.4th 741, 748.)

*b. Applicable Law*

"A dependency proceeding under section 300 is essentially a bifurcated proceeding. First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction. The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction. The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Marquis H., supra,* 212 Cal.App.4th at p. 724.)

---

[5] James joins in Andrea's arguments pursuant to California Rules of Court, rule 8.200(a)(5).

11

In relevant part, section 300, subdivision (a), provides that a child may be adjudged a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)

In other words, section 300, subdivision (a), requires that the parent either harm, or create a substantial risk of harm to, the child who is the subject of the petition. (See *In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1255.) Section 300.2 explains that the purpose of the dependency statutes is to "provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and *to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm*." (§ 300.2, italics added.)

The issue in this case turns on whether the second sentence of section 300, subdivision (a), strictly requires a finding that the substantial risk of harm was created by the parent's conduct toward either the child who is the subject of the petition or that child's sibling. As hereafter discussed we interpret section 300, subdivision (a) as permitting a jurisdictional finding based on the nonaccidental infliction of harm to another child who is not a sibling provided the court finds the conduct harming the other child also creates a substantial risk of harm to the child who is the subject of the petition.

In reaching this conclusion in adopting and applying the statutory construction of section 300, subdivision (a) contained in the recent decision of *In re Marquis H.* to the facts of this case we emphasize and make clear that application requires a case by case evaluation when the injured child is not living with the parents and the child involved is a subject of the dependency petition.

In *In re Marquis H.*, the appellate court held that a child may be declared a dependent under section 300, subdivision (a), based on his or her parents' infliction of

12

nonaccidental harm on another child who is not a sibling of the petitioned child, if the parents' conduct places the petitioned child at a substantial risk of harm. (*In re Marquis H.*, *supra*, 212 Cal.App.4th at p. 726.) There, the San Diego County Health and Human Services Agency filed a petition on behalf of a minor, Marquis, who was ten years old. (*Id.* at p. 721.) Although the petition did not allege that Marquis was abused by his parents, it did allege that Marquis's parents had subjected their grandchildren, who lived with Marquis and his parents, to serious physical abuse by burning them with an iron, repeatedly hitting them with hard objects, stomping on them with their feet, and forcing them to sleep on the kitchen floor. (*Ibid.*) Like Andrea, Marquis's parents argued that section 300, subdivision (a), was inapplicable because the abused minors were not Marquis's siblings. (*Id.* at p. 725.)

In rejecting the parents' argument and finding section 300, subdivision (a), supported exercising jurisdiction over Marquis, the court turned to the rules of statutory construction. (*In re Marquis H.*, *supra*, 212 Cal.App.4th at p. 725.) The court adopted an expansive view of subdivision (a), reasoning that "[g]iven the complexity of the statutory scheme governing dependency, a single provision 'cannot properly be understood except in the context of the entire dependency process of which it is part.'" (*Ibid.*, citing *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The court refused to read subdivision (a) as strictly limiting the juvenile court's exercise of jurisdiction to those specific situations outlined in the subdivision's second sentence. (*In re Marquis H.*, *supra*, 212 Cal.App.4th at p. 725.) Rather, the court interpreted the language of the second sentence to simply provide an example of when jurisdiction under subdivision (a) may be proper. (*Ibid.*)

Appellant argues that *In re Marquis H.* is distinguishable from the present case because there, the abused children resided with Marquis and his parents, unlike Kiara and N.H., who usually lived in separate households. This argument is not persuasive. As both the legislature in section 300.2 and the court in *In re Marquis H.* clearly explain, the purpose of the dependency statutes is to ensure maximum safety and protection for children who are at risk of harm. (§ 300.2; see *In re Marquis H.*, *supra*, 212 Cal.App.4th at p. 726, citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 ["The objective of the

13

dependency scheme is to protect abused or neglected children and those at substantial risk thereof"].)

Regardless of whether Kiara and N.H. are siblings, or whether they permanently resided together, Andrea's treatment of Kiara placed N.H. at a substantial risk of harm. The critical fact is that Kiara suffered horrendous and serious injuries while in Andrea's care. Andrea is N.H.'s mother and exclusive caretaker. These facts placed N.H. at a substantial risk of harm. It is not the label placed on Kiara and N.H.'s relationship or the fact they do not live together[6] that determines whether N.H. faced a substantial risk of harm, but rather the fact that N.H. was exclusively under Andrea's care. Adotping and extending the rationale applied in *In re Marquis H.* to the facts of this case, it would be absurd to interpret section 300, subdivision (a), to prohibit a juvenile court, as a matter of law, from exercising jurisdiction over a child whose parent or guardian was responsible for the serious injuries suffered by another child who was in a living situation similar to the petitioned child. (See *In re Marquis H.*, *supra*, 212 Cal.App.4th at p. 726.) In light of the dependency statutes' purpose of providing maximum protection for the health and safety of children, this court sees no reason why Andrea's treatment of Kiara, who, like N.H., was often under Andrea's care, did not place N.H. at a substantial risk of harm. (See *id.* at p. 725 ["every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect"].)

Adopting and applying the reasoning of the appellate court in *In re Marquis H.* pertaining to statutory interpretation of section 300.2, we find that the evidence in this case is substantial and supportive that Andrea M. or mother's conduct which caused injuries to Kiara establishes a substantial risk of harm to her own child, N.H., if left within her care.

---

[6] The fact that the children lived in the same home in *Marquis H.* certainly elevates the risk of harm. However, the fact that Kiara was a visitor in N.H.'s home does not eliminate the future risk of harm to N.H. in light of N.H.'s relationship with Andrea.

We note that the trial court failed to actively engage in describing and discussing the evidence which indicates the surrounding circumstances which led it to the conclusion that the harm to Kiara established a substantial risk of harm to N.H. However, we note that the principle of implied findings is applicable in this case and supports the trial court's conclusion. The evidence in support of the implied findings finds support in the record as follows:

*Seriousness of Kiara's Injuries:*

Dr. Maria Boechat testified that Kiara's rib fractures are usually caused by squeezing. Xrays taken on October 20, 2011 showed that a number of Kiara's ribs were healing from fractures.

Dr. Claudia Wang testified she saw Kiara initially on October 20, 2011 after suffering a seizure. Examination revealed severe head injuries which included a complex skull fracture, subdural hematoma, bleeding in the brain and the retinal hemorrhage in both eyes. Dr. Wang concluded Kiara's injuries likely resulted from an impact against a non-forgiving surface. Kiara's injuries occurred shortly before her hospitalization because the soft tissue above Kiara's skull were still swollen.

Tischa R. testified to a minor injury she noticed on Kiara's stomach in the form of a scratch at the end of September, 2011. When questioned, Andrea claimed Kiara scratched herself. When Tischa R. expressed doubt about Kiara scratching herself, Andrea said N.H. had scratched her.

*Likely Occurrence in Andrea's Care:*

Kiara and N.H. were very close in age at the time Kiara suffered her injuries. Kiara was one year old. N.H. was also one year old.

Andrea was N.H.'s mother and exclusive care-taker.

James took a passive role in the care of Kiara and displayed a lack of concern about Andrea's treatment of Kiara. James made it clear that he played a little or no role in caring for Kiara or N.H., despite living with Andrea when Kiara suffered her injuries. James was concerned only about his own health which he described as a stomach issue.

15

James heard Kiara cry out on the day of Kiara's injuries, but he did not respond because he was in the bathroom dealing with his chronic stomach problems.

He could not recall who called for an ambulance after Kiara suffered her seizure.

### *Andrea and James' Refusal to Cooperate with Law Enforcement:*

When confronted by DCFS as to the cause of Kiara's injuries, Andrea made no attempt to explain Kiara's injuries while under Andrea's care other than to deny the injuries were caused by her.

Andrea refused to be interviewed by or make a statement to law enforcement officers.

Andrea took the witness stand at time of trial, but refused to testify, invoking her fifth amendment right against self-incrimination.

### *Andrea and James' History of Domestic Violence:*

We note that CSW, Eboni Crowe, cited an alleged history of violence between Andrea and James as a reason for recommending detention of N.H. Our search of the record, however, fails to uncover substantial evidence to support this contention.

## II. *Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings Under Section 300, Subdivisions (a) and (b)*[7]

Andrea M. argues that even if section 300, subdivision (a), may properly apply to the factual scenario in this case, insufficient evidence supported the juvenile court's exercise of jurisdiction over N.H. under section 300, subdivisions (a) and (b). She contends DCFS did not meet its burden of proving the physical abuse allegations, arguing that the expert and percipient witness testimony established that Andrea did not harm

---

[7]     We note that section 300, subdivision (b) is different from subdivision (a) in that it does not have the same sibling language as (a). Regardless of the wording differences between subdivisions (a) and (b) the juvenile court must find something that Andrea has done, either in her supervision of N.H. or some other child such as Kiara which establishes a substantial risk of serious harm to N.H. The evidence that supports an implied finding of substantial risk of harm to N.H. is specifically set forth on pages 15 and 16 of this opinion.

Kiara. Based on the evidence presented at the adjudication hearing, we affirm the juvenile court's findings.

"On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.) When determining whether substantial evidence supports the juvenile court's findings, we defer to the court on issues of credibility of the evidence and witnesses. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734.) "Substantial evidence is evidence that is reasonable, credible, and of solid value." (*In re Veronica G.* (2007) 157 Cal.App.4th 179.)

DCFS's petition on behalf of N.H. alleged facts under section 300, subdivisions (a) and (b). To exercise jurisdiction under subdivision (a), the juvenile court must find that the petitioned child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Under subdivision (b), the juvenile court must find that the petitioned child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b).) Further, under subdivision (b), "[t]he conclusive identity of the perpetrator . . . is not a prerequisite of dependency jurisdiction." (*In re A.S.* (2011) 202 Cal.App.4th 237, 245.) "Unlike criminal proceedings, where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings [is] to fashion appropriate orders in the best interests of the child." (*Ibid.*) As discussed above, the purpose of the dependency statutes is to provide the maximum protection for abused and at-risk children; it is not to punish parents. (§ 300.2; see also *Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 974 ["the purpose of child dependency proceedings is not to punish persons who have committed acts of abuse; it is to serve the child's best interests"].)

Andrea contends insufficient evidence supported the juvenile court's exercise of jurisdiction over N.H. under section 300, subdivisions (a) and (b). As to subdivision (a), Andrea argues the evidence did not establish that Kiara's head injury was intentionally inflicted. She bases this contention on the fact that there was conflicting evidence on the issue. However, the existence of conflicting evidence does not mean that insufficient evidence supported the trial court's decision. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 ["In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them"].)

Nevertheless, even if we were to assume there was insufficient evidence to establish Kiara's injuries were intentionally inflicted, the nature of Kiara's injuries, and the evidence that strongly suggests these injuries occurred while in Andrea's care, support the juvenile court's finding under subdivision (b). (See § 300, subd. (b) [requires only that there exist a substantial risk that the child will suffer serious physical harm as a result of the failure or inability of the parent to adequately supervise or protect the child]; see also *In re A.S.*, *supra*, 202 Cal.App.4th at p. 245 ["[t]he conclusive identity of the perpetrator . . . is not a prerequisite of dependency jurisdiction"].)

At the jurisdictional hearing, the juvenile court heard evidence from several percipient and expert witnesses that indicated Kiara had suffered serious injuries while under Andrea's care. Andrea began babysitting Kiara on August 31, 2011. Prior to entering Andrea's care, Kiara had been a healthy baby. However, on September 21, 2011, Kiara made the first of three hospital visits within a one-month span. Kiara's first two hospital visits were in regard to vomiting and diarrhea, which appeared to be linked to her suffering several rib fractures around the same time. Her third visit gave rise to the present action. On October 20, 2001, while in Andrea's care, Kiara suffered a seizure and was taken by ambulance to the hospital. There, Kiara's rib fractures, complex skull fracture, subdural hematoma, and retinol hemorrhages were discovered. Although Kiara's rib injuries were attributed to an earlier incident, there was strong evidence that Kiara's other injuries occurred on October 20, 2001, while Kiara was in Andrea's care.

18

According to Dr. Wang, Kiara's serious head injuries – i.e., the complex skull fracture, subdural hematoma, and retinol hemorrhages – were likely the result of nonaccidental trauma. Further, Dr. Wang testified that due to the acute nature of Kiara's head injuries, they likely occurred mere hours before Kiara was taken to the hospital. Relying on other witnesses' descriptions of Kiara's jovial behavior before she was dropped off at Andrea's apartment on October 20, 2011, Dr. Wang opined that Kiara could not have been suffering from her injuries at that time. Based on this information, Dr. Wang concluded that Kiara's injuries were the result of child abuse that likely occurred while Kiara was in Andrea's care.

In sustaining DCFS's petition under section 300, subdivisions (a) and (b), the court made the following finding: "With the description of this injury, the severity of this injury as described by Dr. Wang, it is not the sort of thing that, yes, the edema might occur later. The seizure activity. This child would be screaming. This child would be in severe pain. This child would be out of it. More than just 'not herself.' She had a skull fracture that went to multiple areas of her skull . . . I think if that injury had occurred earlier, she would have been far more than 'not quite herself.'" In issuing its ruling under section 300, the juvenile court stated, "[Kiara] was hospitalized and found to be suffering from a detrimental and endangering condition consisting of a subdural hematoma, swelling to [her] brain and skull fractures. [Kiara] sustained retinal hemorrhages to [her] left eye. [Kiara] sustained healing fractures of [her] sixth, seventh, eighth and ninth left ribs. [N.H.'s mother, Andrea], gave no explanation of the manner in which [Kiara] sustained her injuries. [Kiara's] injuries are consistent with inflicted trauma. Such injuries would not ordinarily occur except as a result of deliberate, unreasonable, and neglectful acts by [Andrea], who had care and supervision of [Kiara] at the time [she] sustained [her] head and rib injuries. Such deliberate, unreasonable, and neglectful acts on the part of [Andrea] to [Kiara] endangers [N.H.'s] physical health, safety, and well-being, creates a detrimental home environment, and places [N.H.] at risk of physical harm, damage, and danger."

19

Despite the existence of conflicting expert opinions, the juvenile court clearly and properly relied on Dr. Wang's expert opinion that Kiara was the victim of child abuse while in Andrea's care, and that, as a result, Andrea's conduct created a substantial risk of harm for N.H. On appeal, we must resolve all conflicts in the juvenile court's favor, and we must uphold the juvenile court's findings unless we conclude there is no substantial evidence to support the findings. (*In re Christopher C.*, *supra*, 182 Cal.App.4th at p. 84.) Thus, the evidence was sufficient to support the juvenile court's findings under section 300, subdivisions (a) and (b).

## III. *Sufficient Evidence Supported the Juvenile Court's Disposition Order Removing N.H. from Her Mother's Custody*

Finally, Andrea argues there was insufficient evidence to support the juvenile court's decision to remove N.H. from Andrea's custody. She further argues the juvenile court's removal order was improper because the court did not consider reasonable alternatives before ordering N.H. removed from Andrea's custody. We disagree.

### a. *Standard of Review*

We review a juvenile court's disposition order removing a child from parental custody for substantial evidence, while recognizing that the heightened 'clear and convincing evidence' standard applies to such orders. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; see *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.) However, "on appeal from a judgment required to be based upon clear and convincing evidence, the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) Therefore, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

### b. *Applicable Law*

Under section 361, subdivision (c)(1), a juvenile court may order the removal of a dependent child from the physical custody of his or her parents if the court finds by clear and convincing evidence that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) That same subdivision goes on to state "[t]he court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1).)

"A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent." (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.) Jurisdictional findings are prima facie evidence the child cannot safely remain in the custody of the parent. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate." (*Ibid.*) "The focus of the statute is on averting harm to the child." (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.) "The court may consider a parent's past conduct as well as present circumstances." (*Ibid.*)

In *In re A.S.*, the juvenile court declared eight-month-old A.S. a dependent of the court and ordered her removal from her parents' custody after she suffered numerous severe and unexplained injuries. (*In re A.S.*, *supra*, 202 Cal.App.4th at pp. 240-242.) While her parents were at work, A.S. was in the care of her grandfather and great aunt. (*Id.* at p. 240.) While drinking from a bottle unattended, A.S. began to choke. (*Ibid.*) After discovering A.S. limp, her grandfather took her to the hospital, where it was determined that she had suffered a subdural hematoma and bilateral retinal hemorrhages. (*Ibid.*) A.S.'s parents told the doctors that she was healthy when they left her with the

21

grandfather, and that they were unaware of any traumatic event that could have led to her condition. (*Ibid.*) The grandfather told the doctors that he had walked away from A.S. while she was drinking from a bottle. (*Ibid.*) He then heard her choking and returned to find her limp. (*Ibid.*) Neither A.S.'s parents, nor her grandparents, could offer an explanation for her injuries. (*Ibid.*)

The San Diego County Health and Human Services Agency ("DCHHS") took A.S. into protective custody and filed a petition on her behalf under section 300, subdivision (b). (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 240.) A.S.'s attending physician informed DCHHS that A.S.'s injuries were most likely associated with A.S. being shaken or slammed on a soft surface, but she could not determine the exact time or date of the injuries. (*Id.* at p. 241.) She concluded that the injuries were nonaccidental because none of A.S.'s caretakers could offer an explanation for them. (*Ibid.*)

Following a contested jurisdiction and disposition hearing, the juvenile court declared A.S. a dependent of the court and ordered her removal from her parents' custody. (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.) In making its order, the court explained, "it is appropriate to remove the child from the home at this point because of the lack of an explanation as to how this happened." (*Ibid.*)

The appellate court affirmed the juvenile court's order. (*Ibid.*) In doing so, the court rejected the parents' argument that the evidence did not affirmatively prove that A.S. was injured while in their care, and therefore, could not support a removal order. (*Id.* at pp. 247-248 ["[t]he notion that the court was required to return A.S. home at the disposition stage when the medical evidence did not *prove* she was in the parents' custody when she was injured is mistaken"], original italics.) The appellate court went on to hold that the evidence that A.S. may have been injured while in her parents' care supported the juvenile court's findings that reasonable efforts were made to prevent the need for A.S.'s removal from her parents' home. (*Ibid.*) The court further noted that A.S.'s young age and the severity of her injuries lent further support to the juvenile court's removal order. (*Ibid.*)

Although N.H. did not suffer any injuries herself, this case is otherwise very similar to *In re A.S.*, and the juvenile court's removal order will be affirmed for the same reasons. Here, Kiara, who was a one-year-old at the time DCFS filed its petition, suffered numerous serious injuries that were discovered while she was in Andrea's care. In support of its petition on behalf of N.H., DCFS offered expert testimony, which the juvenile court relied on in making its order, that concluded Kiara's injuries were nonaccidental and, due to their timing, could have occurred while she was in Andrea's care. When approached about the issue prior to the dependency proceedings, Andrea made no attempt to explain how Kiara suffered her injuries. Given that the evidence supports the conclusion that Kiara may have been injured while in Andrea's care, and that both N.H. and Kiara were of such a young and defenseless age at the time Kiara suffered her saddening injuries, there was sufficient evidence to support the juvenile court's disposition order removing N.H. from Andrea's care. (See *In re A.S.*, *supra*, 202 Cal.App.4th at p. 248.) Further, the evidence suggesting that Kiara was likely injured while in Andrea's care supported the juvenile court's finding that reasonable efforts were made to prevent N.H.'s removal from Andrea's custody. (See *ibid.* ["the evidence that A.S. may have been in the parents' care when she was injured supports the court's finding that 'reasonable efforts were made to prevent or eliminate the need for the removal of the child from the home'"].)

Despite Andrea's contentions, the holding in *In re Hailey T.* (2012) 212 Cal.App.4th 139, does not undermine the juvenile court's findings. There, the Fourth District reversed the juvenile court's order removing four-year-old Hailey from her home after her one-month-old brother, Nathan, suffered nonaccidental injuries. (*Id.* at pp. 142-146.) The appellate court reversed the juvenile court's order based on a number of factors that distinguish *In re Hailey T.* from the present case. Importantly, the court recognized that Hailey and her brother were far apart in age. (*Id.* at p. 147.) Unlike her injured infant brother, Hailey was a four-year-old girl, "with good language skills and an outgoing social nature[,]" and she attended a school where she was in regular contact with teachers and other officials who were required by law to report any suspected abuse.

23

(*Id.* at p. 147.) There was also evidence that Hailey's parents shared a healthy relationship, where both exercised responsibility over Hailey and her brother. (*Ibid.*) Additionally, Hailey's parents enrolled in services early in the dependency process, and had begun to have productive and meaningful visits with their children. (*Ibid.*)

In contrast to Hailey, N.H. was a one-year-old at the time of the dependency proceedings. She was too young to articulate whether she was being abused or felt threatened by her parents. Rather, the juvenile court had to rely on the evidence of Kiara's serious injuries and the expert testimony of Dr. Wang, which strongly suggested that Kiara's injuries were nonaccidental and likely occurred during the time period during which she was in Andrea's care. Further, Andrea presented no evidence that she had enrolled in services prior to the contested jurisdiction and disposition hearing; she made no attempt to show the juvenile court that she was taking action to correct the issues that likely led to Kiara's injuries, and which could have led to N.H. suffering similar injuries in the future. Thus, ample evidence supported the juvenile court's removal order.

### *Father's Issues on Appeal*

### *I. The Juvenile Court Acted Within Its Discretion in Ordering Appellant Father to Attend Parenting Education Classes and Individual Counseling*

N.H.'s father, James, argues that the juvenile court abused its discretion when it ordered him to participate in parenting education classes and individual counseling. Specifically, he argues that the order did not address the circumstances that led to the dependency proceeding in the instant case. We disagree and conclude that the juvenile court acted well within its discretion in ordering James to attend parenting education classes and individual counseling.

Section 362, subdivision (d), provides: "The juvenile court may direct any reasonable orders *to the parents or guardians* of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section, . . . [including] a direction to participate in a counseling or education program . . . ." (§ 362, subd. (d).) Under section 362, subdivision (d), "[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interests and

24

to fashion a disposition order accordingly." (*In re A.E.* (2008) 168 Cal.App.4th 1, 4.) Thus, on appeal, "this determination cannot be reversed absent a clear abuse of discretion." (*Ibid.*) Therefore, we will not disturb the juvenile court's decision unless the court "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination . . . ." (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456.)

At the disposition hearing, the juvenile court stated its reasons for ordering James H. to participate in parenting education classes and individual counseling. The court recognized that "[t]here are issues in the dynamic with the family relationship now. And that dynamic is going to be severely tested. So I am ordering counseling . . . ." Acknowledging the fact that James was not responsible for Kiara's injuries, the court expressed concern about the father's attitude toward Andrea's behavior, stating "I think your client is non-offending, but he appears to be taking, even though it was another child, he seems to be taking a very passive role in all of this, and he did not appear to be accepting of the responsibility of the mother."

Looking at the juvenile court's findings regarding James's concerning behavior, the facts of this case are similar to those in *In re A.E.* There, DCFS filed a petition on behalf of two minors, a three-year-old child and his six-year-old sister, after the agency received a report that their mother had struck the three-year-old child with a spatula, leaving bruises. (*In re A.E.*, *supra*, 168 Cal.App.4th at p. 2.) Following a contested jurisdiction and disposition hearing, the juvenile court declared the children dependents of the court. (*Id.* at p. 4.) Although the juvenile court found that the children's father was not involved in the abusive conduct, the court nevertheless ordered him to participate in parenting education classes and individual counseling. (*Ibid.*) On appeal, the father challenged the juvenile court's order, arguing the court abused its discretion in ordering him to attend parenting education classes and individual counseling because he was not involved in the abusive conduct that gave rise to the petition. (*Id.* at p. 5.)

Although the father's lack of objection to the order at the disposition hearing was sufficient to forfeit his claim on appeal, the appellate court addressed the merits of the

father's appeal. (*In re A.E.*, *supra*, 168 Cal.App.4th at p. 4.) In holding that the order was well within the juvenile court's discretion, the appellate court looked to the father's attitude towards the mother's abusive conduct. (*Ibid.*) The court acknowledged that throughout the proceedings leading up to the juvenile court's decision, the father "displayed a worrisome attitude about the corporal punishment of small children[,]" and would not acknowledge that the mother was responsible for the child's injuries. (*Ibid.*) The appellate court admonished the father, stating "[he] is responsible for the children's safety and well-being and must therefore unequivocally oppose harsh and unsuitable corporal punishment." (*Ibid.*)

Similarly here, James displayed a lack of concern toward Andrea's treatment of Kiara. When the case was first being investigated, James denied the allegations against Andrea. James maintained this position throughout the proceedings, despite Dr. Wang's testimony that strongly suggested Andrea was responsible for Kiara's injuries. Further, James made it clear that he played little to no role in caring for N.H. or Kiara, despite the fact that he was living with Andrea during the time Kiara suffered her injuries. Rather, James was only concerned about his own health. Regardless of James's excuses for not playing an active role in caring for N.H. and Kiara, it was unacceptable for him to turn a blind eye to Andrea's conduct that led to Kiara's serious injuries, and which could have led to his daughter suffering serious injuries had DCFS not intervened. (See *In re A.E.*, *supra*, 168 Cal.App.4th at pp. 4-5.) Therefore, the juvenile court acted well within its discretion in ordering James to attend parenting education classes and individual counseling because the court was justifiably concerned about N.H.'s safety and protection. (See *id.* at p. 5 ["The reason for the order was that father displayed an attitude and approach to corporal punishment of small children that justifiably concerned the trial court"].)

## *DISPOSITION*

The juvenile court's order is affirmed.

                                            **WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**