Filed 7/26/23 In re M.K. CA2/3
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.K., et al., Persons Coming Under the Juvenile Court Law. | B307066 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.K., et al., Defendants and Appellants. | Los Angeles County Super. Ct. Nos. 18CCJP04153I, 18CCJP04153J, 18CCJP04153K, 18CCJP04153L, 18CCJP04153M, 18CCJP04153N, 18CCJP04153O, 18CCJP04153P |

APPEALS from orders of the Superior Court of Los Angeles County, Martha Matthews, Judge. Dismissed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant L.K.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant S.R.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

---

Father and mother separately appealed from the juvenile court's jurisdictional findings and orders declaring their three children dependents of the court under Welfare and Institutions Code section 300, subdivision (b)(1).[1]  Mother also appealed from the court's orders declaring five of her other children dependents. We originally issued an opinion in this case on July 15, 2021. We dismissed the appeals as moot because the juvenile court had terminated its jurisdiction over the children, and the jurisdictional findings were not the basis of any current order adverse to either parent.

On October 20, 2021, the California Supreme Court granted parents' petitions for review and deferred further action on the matter pending its decision on a related issue in *In re D.P.* (S267429).  On January 19, 2023, the California Supreme Court issued its opinion in *In re D.P.* (2023) 14 Cal.5th 266, 273 (*D.P.*), concluding the Court of Appeal erred in reasoning a parent seeking discretionary review of a moot appeal " 'must demonstrate the specific legal or practical negative consequences that will result from the jurisdictional findings they seek to reverse.' "  On April 19, 2023, the court transferred the case back to us with directions to vacate our decision and reconsider the cause in light of *D.P.*

---

[1]     Statutory references are to the Welfare and Institutions Code.

2

We now vacate our original opinion and issue this new opinion again dismissing parents' appeals as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Petition and event leading to its filing*

Mother has nine children.  From oldest to youngest they are:  I.W. (born March 2003)—who was dismissed from the case; M.M.K. (born December 2004)—her father is deceased; J.D.A. (born April 2007), M.Y.A. (born May 2010), M.N.A. (born August 2014), and N.A. (born April 2017)—their father is Derek A.[2] (collectively, the A. children); and A.P.R. (born January 2018), B.K. (born November 2018), and A.R. (born February 2020)— their father is father (collectively, the R. children).

In February 2020, the Los Angeles County Department of Children and Family Services (Department) filed a juvenile dependency petition under section 300, subdivision (b) on behalf of all nine children following events surrounding A.R.'s birth at a Kaiser hospital.  The petition—as the juvenile court amended and ultimately sustained it—alleged:  mother "has mental and emotional problems including, combative and disorderly behavior, which renders the mother incapable of safely providing regular care for the children"; mother was involuntarily hospitalized for "the evaluation and treatment of [her] psychiatric condition" about two days after A.R.'s birth; father and Derek A. "knew or reasonably should have known of . . . mother's mental and emotional problems and failed to protect" their respective children by allowing her to have unlimited access to the children and by father also having allowed mother to live in his children's home; and mother's mental and emotional problems as well as

---

[2]      Derek A. is not a party to this appeal.

Derek A.'s and father's failure to protect the children endangered the children's physical health and safety and placed them at risk of serious physical harm.

The day after A.R. was born, the Department received a referral alleging mother had been "extremely aggressive during" A.R.'s birth. Paramedics had brought mother to a Kaiser hospital. She had not received any prenatal care and had "dangerously high blood pressure." She was having a "hard time" complying with her blood pressure treatment. Mother had been advised to stay in the hospital until her blood pressure stabilized, but she wanted to leave. Mother also tested positive for marijuana at the time of delivery. The reporting party claimed mother was not allowing the nurses to check the baby's vital signs or urine, and she had been co-sleeping with the baby against medical advice.

The Department interviewed hospital staff, the family, and others. A hospital social worker described mother as "displaying behavior of paranoia." A nurse noted mother said she knew better than the doctors how "to give birth from her body." Mother was "very belligerent" and kicked the obstetrician during the delivery. The charge nurse said, "mother was not lying down during the birth of her child," and at one point "stood up on the labor and delivery table." The nurse had difficulty in attending to mother "due to her combative behavior." The hospital staff confirmed mother had not had any prenatal care, had had preeclampsia, and was suffering from very high blood pressure that was not going down.

At one point, mother told hospital staff "she [was] leaving the hospital without anyone stopping her." The hospital social worker thought mother was showing signs of delusions and might

4

be "a true detriment" to herself and her baby. After mother refused a psychiatric evaluation, she was placed on a 72-hour hold. Law enforcement restrained mother so hospital staff could medicate her. Mother's high blood pressure led the hospital social worker to believe she might be suffering from post-partum psychosis.

Two days after A.R.'s birth, the Department social worker tried to interview mother, but she told him to "get out of [her] hospital room." Father told the social worker he and mother lived together with their three children (including the new baby) and mother's oldest daughter M.M.K. The A. children lived with Derek A. Father had been in the ambulance with mother and present at A.R.'s birth. He said he had never seen mother exhibit any psychotic behavior or episodes. He denied any past substance abuse in the family and agreed to take a drug test.

Father said mother was not mentally ill. She was frantic and a "bit out of control" because she was in a lot of pain and overwhelmed with the pregnancy and "being [at]tended to by too many people." He told the social worker mother was "very smart and really in tune with her body and was trying to tell the hospital staff that information." Father believed the hospital was reacting the way it was because mother refused any shots or vaccines for her child. He said mother did not believe in Western medicine; she did not want any of her children to be vaccinated. He reiterated mother was not " 'crazy' "—she had very strong opinions and "is not one to conform to pressure from anyone."

Father also said mother was not responding well to the medication the doctors had given her. The nurses constantly coming in and out of her hospital room "really overwhelmed and agitated" her because she was not feeling well.

The hospital staff was "worried that mother w[ould] hurt herself and/or the baby if she [were] released." Ultimately, the hospital removed the baby from mother's hospital room "due to safety concerns" based on mother's refusal to take psychotropic medication or medication for her high blood pressure.

After initially refusing to speak to the Department, mother requested an interview. Mother told the social worker she did not want to talk to him when he first contacted her because she was losing a lot of blood and was not ready to speak to anyone, "especially a [Department] worker." She said she was "in a slew of lawsuits" against the Department, her last employer, and another business. Mother denied any mental health issues. She said she was not combative during the birth of her child but was in a "heightened state." She was in pain and the hospital refused to follow her birth plan.

Derek A. also told the social worker mother was not " 'crazy.' " He and mother were together for 12 years. He had no concerns about her mental health and denied present or past substance abuse or domestic violence in the family. Their children stay with mother while Derek A. works. She watches their youngest child—under three years old at the time—"all of the time," and the other children when they are not in school.

The older A. children, M.Y.A., age nine at the time, and J.D.A., age 12 at the time, said they felt "fine" with mother. They felt safe in both Derek A.'s and mother's homes and said they had enough food and clothing at both homes. M.M.K., age 15 at the time, also had no concerns about mother. She said her relationship with mother was " 'just alright' " and she was " 'fine' " with it. I.W., age 16 at the time, said he felt comfortable and safe when with mother, but he primarily lived with paternal

6

grandmother. The children all denied having witnessed any physical confrontations between mother and anyone in the home or having received or seen any physical discipline.

The Department social worker also interviewed the property manager for mother's apartment, before and after the detention hearing. The manager described the following complaints about mother: Mother tried to get into another apartment to fight the resident's daughter whom she believed was having an affair with father; law enforcement was called. (The social worker later met with father; he denied having an affair and did not know why mother believed he had.) Mother accused maintenance staff of "doing things with the gas in her apartment." Mother had complained of a gas leak, but when she would not allow the gas line worker to enter her apartment, law enforcement was called. And, mother's neighbors had told the manager they could hear a baby cry for "a prolonged period of time" and were concerned about who was "attending to the child."

On February 13, 2020, Kaiser transferred mother to a psychiatric hospital. The psychiatric hospital was unable to treat mother's high blood pressure, however, and transferred her to San Gabriel Valley Medical Center. Mother received a psychiatric evaluation there.

The evaluation notes state mother was agitated after Kaiser staff gave her newborn a vitamin K injection against her wishes. Mother then was given an injection of Haldol. The examining doctor at San Gabriel found mother was "alert, oriented to time, place, and person, quite pleasant and speaks clearly and quite rational." The notes state mother was "[g]oing through significant issues with Kaiser Hospital" and "fe[lt] that she was mistreated and they violated the HIPAA. The patient

denies any psychotic symptoms." The doctor found mother's "mental status examination is unremarkable." The doctor listed mother's diagnosis as "Adjustment disorder with anxiety." The notes state, "The plan is [to] discontinue the hold. Continue medical treatment. Can be discharged home when medically stabilized."

The Department assessed the children as being at future risk of harm based on "mother potentially having a mental illness that has been undiagnosed and not believing she needs treatment." As a result, the Department obtained a removal order for all of mother's children. Mother agreed to move out of the home she shared with father so their children could stay there with him. The Department placed M.M.K., who was not father's daughter, in foster care.

In its detention report, the Department described six earlier referrals it had received about mother between 2008 and 2019. Every referral except one was deemed "unfounded" or "inconclusive." The Department "substantiated" a May 2018 allegation that mother failed to bring A.P.R., who was born prematurely, to medical appointments to look for risks of retinal detachment and failed to update M.M.K.'s immunizations causing her to miss school. The Department filed a section 300 petition on behalf of the children alleging mother physically abused M.M.K. and J.D.A., mother and father engaged in domestic violence in front of the children, and mother and father medically neglected A.P.R. In August 2018, the juvenile court dismissed that petition with prejudice.

A more recent October 2019 referral alleged mother had emotionally abused her children. M.M.K.'s school reported mother verbally abused M.M.K. over the phone when mother

called the school after M.M.K. left home without permission. M.M.K. and mother both denied any abuse. Derek A. also said there was no abuse. He said his children were with him 90 percent of the time, and mother was a "good mom." The Department concluded the allegations were unfounded as to M.M.K. and inconclusive as to the other children.

## 2. *Detention*

At the February 24, 2020 detention hearing, the juvenile court detained mother's youngest children from her and ordered monitored visitation; released the three R. children to father and the youngest A. children, M.N.A. and N.A., to Derek A.; released the two older A. children, J.D.A. and M.Y.A., to both parents; and released M.M.K. to home of mother on the condition the Department assess the safety of maternal aunt's home, where mother was living. (Ultimately, M.M.K. was placed in foster care and detained from mother with monitored visitation.)

I.W. was arrested the next day for robbery. Mother reportedly was screaming in the lobby of the police station and at someone on her phone. A detective told the social worker mother "was behaving hysterically and making outlandish claims." Officers turned on their body cameras in response to mother's disruptive behavior.

## 3. *Continued investigation*

The Department interviewed the family again in late February and early March 2020. The older children continued to deny any physical or substance abuse in the home or that mother had mental health problems. Mother, father, and Derek A. did too. Derek A. said mother "just has a personality that rubs people the wrong way."

Derek A. also mentioned he had been getting upset with mother because she was not picking the children up from school or feeding them when they went to her home. They sometimes were dirty when they returned to him. He felt mother's current mental status had something to do with her relationship with father. Mother told him she didn't have money for food and father was "starving her." She told him father was saving his money and was about to leave her. Derek A. also felt mother might have had postpartum depression after delivering M.Y.A. and M.N.A. He said mother had come from a dysfunctional family, and she and her sister were abused by their stepfather.

The Department learned that in January 2020, M.M.K. had called the police alleging father had assaulted mother. The police responded and were told it was only a verbal argument. They did not see any battery.

### 4. *Jurisdiction*

Due to the Covid-19 pandemic, the adjudication hearing was continued from March to June 2020. In its last minute information, the Department reported it had followed up with the hospital social worker who recalled mother yelled at I.W. when he visited her at the hospital, " 'Do something! You should protect me!' " She described mother as " 'a bully.' " The social worker also said that—according to 2018 medical records Kaiser obtained—at the birth of her eighth child mother had acted erratically, was argumentative and non-compliant, and tested positive for marijuana.

M.M.K told the social worker that, during a call with mother, mother " 'talked deviously' " about her caregiver. M.M.K. said mother was making false accusations about the caregiver and M.M.K. defended her. She ultimately hung up on mother.

10

On June 22, 2020, the court convened the contested jurisdiction hearing.  Father testified.  He said mother had never acted erratically or aggressively in front of him and to his knowledge had never been diagnosed with a mental health condition.  He testified about the events at Kaiser, including that mother was in more pain than normal during A.R.'s birth and believed something was wrong.  He also said mother never prevented the staff from checking on the baby but asked them to come back after she finished feeding him.  He said mother was trying to leave the hospital when placed on the psychiatric hold.

After hearing father's testimony and argument by all counsel, the court agreed that, if the incident at Kaiser were the only evidence, it would not be sufficient to sustain the petition.  "The problem" was that the Kaiser incident "[wa]sn't the only evidence in the case."  The court found, in addition to mother's "conflicted situation with Kaiser" that could have harmed her baby, there was "quite a bit of evidence" demonstrating mother had a "pattern of behavior involving sort of serious explosive conflicts with various other people" that affected the safety of her children.

The court described at length the evidence it found supported sustaining the petition.  The court was "quite concern[ed]" by the fact mother did not believe in Western medicine and did not want her baby to have "any shots or vaccines."  The court noted mother's dispute with Kaiser over giving A.R. an injection that "Kaiser believed was necessary for the baby's wellbeing" and that she potentially placed him at "a great deal of  risk" by failing to receive prenatal care.  Kaiser also had difficulty monitoring A.R.'s wellbeing "[i]n the midst of all of this conflict" with mother.  The court observed

11

mother "actively resisted getting healthcare" and that refusal "could have caused harm to the baby," presumably referring to Kaiser trying to treat mother's high blood pressure. The court mentioned mother yelled at I.W. in the hospital as if the situation were his fault and screamed and acted aggressively at the police station when he was arrested.

The court also remarked on the various conflicts mother had with others, her attempt to fight with another tenant, and her estrangement from one of her sisters. The court noted M.M.K. called the police alleging mother and father had been in an altercation, and Derek A. reported mother had been inconsistent in picking up their children from school and sometimes returned them to him dirty and hungry. Mother also had failed to get a birth certificate for N.A.

The court sustained the count (as amended) based on mother's mental health issues and dismissed with prejudice the two counts concerning mother's and father's marijuana use. The court noted mother's February psychiatric evaluation revealed she did not have a diagnosable mental health condition. At mother's request, the court set the disposition hearing for August 6, 2020, to give her time to obtain a mental health evaluation to assess whether there were any issues that would prevent her from being able to care for her children safely.

**5.** *Post-jurisdiction and disposition*

On August 4, 2020, the appointed forensic psychologist evaluated mother in a clinical interview and psychologically tested her with the Minnesota Multiphasic Personality Inventory. Mother's personality test was "entirely within normal limits." The testing showed mother was "more assertive than the typical woman." The psychologist characterized mother as "impassioned,

but not paranoid" and having "some inclination to be litigious." She opined, "Childbirth is clearly a very stressful time, with biological and sometimes psychiatric changes. However, given the current test results, it does not appear that [m]other has psychological/psychiatric symptoms that would make a return to the minors risky."

The psychologist concluded there was no current support for "the presence of a delusional disorder, any other major mental health disorder, . . [or] . . . personality disorder." The psychologist could not opine on what happened at Kaiser but concluded mother currently "functions within normal limits psychologically."

At the August 6 disposition hearing, the juvenile court found the mental health evaluation to be "quite explicit about finding that . . . mother does not suffer from any ongoing mental health disorder or personality disorder and . . . although, she presents as someone who perhaps gets into conflict with people and sort of sticks up for her right or her position, . . . that is within normal psychological limits." The court found the psychologist's report consistent with the fathers' reports that mother is "an unusual person" and "does get into conflicts with people," and that neither thought she wasn't a "safe caregiver" for the children. The court also noted the children denied having been abused or neglected by mother or seeing any "sort of strange behavior" by her.

The court concluded the Department had not met its burden of proof by clear and convincing evidence that the children could not safely be returned to mother. It released the A. and R. children to home of parents and M.M.K. to home of mother. The court explained, "It's not that there haven't

13

been issues, it's just that there really isn't any indication that whatever mother's challenges are have actually led to any harm or concrete risk of harm to her children."

**6.    *Appeals***

Father and mother separately appealed from the adjudication of their children as dependents under section 300. They argued the court's jurisdictional findings were in error because mother's behavior at Kaiser was an isolated incident, and the evidence showed the children were never harmed or at risk of harm as a result of mother's alleged mental and emotional problems (or father's alleged failure to protect).  During the pendency of their appeals, on March 2, 2021, the juvenile court entered orders finding the conditions that "would justify the initial assumption of jurisdiction under WIC [section] 300 no longer exist and are not likely to exist if supervision is withdrawn" over the children.  The court terminated its jurisdiction and awarded mother and father joint custody of their children, mother and Derek A. joint custody of their children, and mother sole custody of M.M.K.[3]

At our request, the parties provided additional briefing[4] as to why parents' appeals should not be dismissed as moot, in light of the juvenile court's termination of its jurisdiction and return of the children to their parents' custody.  As noted, in an opinion filed on July 15, 2021, a different panel of this court dismissed parents' appeals as moot.  (*In re M.K.* (July 15, 2021,

---

[3]    On March 5, 2021, we granted mother's request for judicial notice of the juvenile court's March 2, 2021 orders.

[4]    Mother and father filed responsive letter briefs; the Department did not respond.

B307066) [nonpub. opn.].) As directed by the California Supreme Court, we now have vacated our prior decision and reconsidered the matter in light of *D.P.*[5]

## DISCUSSION

**1.** ***Parents' appeals are moot under*** **D.P.**

As our high court reiterated in *D.P.*:

> "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.] A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome plaintiff seeks." (*D.P., supra*, 14 Cal.5th at p. 276 [mootness rule applies in dependency context].)

We must " ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [our] decision would affect the outcome in a subsequent proceeding." ' " (*D.P., supra*, 14 Cal.5th at p. 276.)

---

[5] Neither mother nor father filed supplemental briefing under rule 8.200(b) of the California Rules of Court.

15

"[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60, cited by *D.P.,* at p. 276.) "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' " (*D.P.*, at p. 277, quoting *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) Thus, "to show a need for effective relief, the plaintiff must first demonstrate that he or she has suffered from a change in legal status." (*D.P.*, at p. 277.)

In this case, we again conclude we can give no effective relief to parents. The juvenile court has terminated its jurisdiction. Its custody orders are favorable to both mother and father: they share joint custody of their children, and mother shares joint custody with Derek A. of their children and sole custody of M.M.K. In other words, the court returned the families to their status quo before the Department filed the section 300 petition. Thus, parents cannot show they suffered a change in legal status.

In her previously-filed supplemental letter brief, mother nevertheless argued reversal and vacation of the jurisdictional findings would provide her with effective relief by removing "[a]ny shadow of doubt about the stability of the safety of [her] home, cast by the history in this matter." In his supplemental letter brief, father argued the juvenile court's purported erroneous jurisdictional findings could have severe and unfair consequences to parents in a future dependency or family law proceeding: they could serve as a basis for a detriment finding under section 361.2 if a non-custodial parent seeks custody; be used to bypass parents for services under section 361.5 in a future dependency proceeding or to formulate their case plans;

16

or be considered in a family law proceeding by a court determining visitation or custody rights.

Parents have not demonstrated a favorable ruling from this court would have a tangible effect on their legal status. As the court in *D.P.* stated, "Although a jurisdictional finding that a parent engaged in abuse or neglect of a child is generally stigmatizing, complaining of 'stigma' alone is insufficient to sustain an appeal.  The stigma must be paired with some effect on the plaintiff's legal status that is capable of being redressed by a favorable court decision." (*D.P., supra*, 14 Cal.5th at p. 277.) Mother has not demonstrated how any stigma associated with the court's jurisdictional findings is adversely affecting her legal rights or status.  Those findings are not the basis of any current or proposed order restricting either parent's rights.  (Cf. *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547–1548 [appeal from jurisdictional findings not moot where the juvenile court had entered "restrictive visitation and custody orders" adverse to appellant father based on those findings before terminating its jurisdiction].)

Moreover, parents only can speculate about future harm they might suffer in hypothetical future proceedings due to the jurisdictional findings.  Father specifically relied on *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716, in asserting parents' appeals are not moot because the juvenile court's purported error "could have severe and unfair consequences" on parents in the future.  Our high court, however specifically disapproved of *In re Daisy H.* "to the extent it held, contrary to [the court's] opinion [in *D.P.*], that speculative future harm is sufficient to avoid mootness." (*D.P., supra*, 14 Cal.5th at p. 278.)  As neither parent has shown the juvenile court's jurisdictional findings are under

17

consideration in another proceeding as a basis for an adverse action against him or her—and there are no continuing adverse orders against either parent that depend on the validity of those findings—they have failed to demonstrate "a specific legal consequence that a favorable judgment could redress." (*Id.* at pp. 272, 278–282 [concluding stigma and mere possibility of inclusion in California's Child Abuse Central Index too speculative to overcome mootness of appeal from jurisdiction findings based on neglect resulting in child's injury after court terminated its jurisdiction].)  Their appeals from the court's jurisdictional findings thus are moot.

**2.      *We consider whether to exercise our discretion to review the merits of the appeals in light of* D.P.**

a.      *Applicable law*

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of a dispute."  (*D.P., supra*, 14 Cal.5th at p. 282.)  In our original opinion, we declined to exercise our discretion to review the merits of parents' appeals because neither had shown any adverse effects from the purportedly erroneous jurisdictional findings.  As our high court in *D.P.* explained, however, "[w]hether or not a parent has demonstrated a specific legal or practical consequence that would be avoided upon reversal of the jurisdictional findings is what determines whether the case is moot or not moot[,] . . . not what determines *whether a court has discretion* to decide the merits of a moot case."  (*Id.* at p. 283, italics added.)  The court noted that, "[b]ecause dismissal of an appeal for mootness operates as an affirmance of the underlying judgment or order [citation], such dismissals may ' "ha[ve] the undesirable result of insulating erroneous or arbitrary rulings from review." ' "

(*Id.* at p. 285.)  The court went on to discuss a variety of factors appellate courts "have properly considered" in "opt[ing] to exercise their inherent discretion to decide certain challenges to juvenile court jurisdictional findings."  (*Ibid.*)

For example, courts may consider whether challenged jurisdictional findings could prejudice the parent, potentially affect the current or future dependency proceedings, or have other consequences for the parent beyond jurisdiction.  (*D.P., supra*, 14 Cal.5th at p. 285.)  Our high court also noted "[t]he exercise of discretionary review may . . . be informed by whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct.  [Citations.]  Though stigma alone will not sustain an appeal, a court may consider the nature of the allegations against the parent when deciding whether discretionary review is proper.  The more egregious the findings against the parent, the greater the parent's interest in challenging such findings."  (*Id.* at pp. 285–286.)  Finally, the court explained "[a] court may also consider why the appeal became moot," noting where, as there, "the case becomes moot due to prompt compliance by parents with their case plan, discretionary review may be especially appropriate."  (*Id.* at p. 286.)  Thus,"[p]rinciples of fairness may . . . favor discretionary review of cases rendered moot by the prompt compliance or otherwise laudable behavior of the parent challenging the jurisdictional finding on appeal."  (*Ibid.*)  In so concluding, the court noted, "It would perversely incentivize noncompliance if mootness doctrine resulted in the availability of appeals from jurisdictional findings only for parents who are less compliant or for whom the court has issued additional orders."  (*Ibid.*)

As our high court stated, however, "Ultimately, in deciding whether to exercise its discretion, a court should be guided by the overarching goals of the dependency system:  'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.'  [Citations.] Given the short timeframes associated with dependency cases and the potentially significant, if sometimes uncertain, consequences that may flow from jurisdictional findings, consideration of the overarching purposes of the dependency system may counsel in favor of reviewing a parent's appeal despite its mootness." (*D.P.*, *supra*, 14 Cal.5th at pp. 286–287.)

3.     ***We decline to exercise our discretion to conduct a merits review here***

Although parents' arguments were insufficient to demonstrate their appeals were not moot, we consider them in deciding whether to exercise our discretionary review under the guidance of *D.P.*  As noted, parents challenged the juvenile court's jurisdictional findings as "unsubstantiated by evidence and the law."  In her letter brief, mother asserted the Department's arguments did not provide a basis for dependency—that mother's reactions during a painful childbirth, while she had high blood pressure due to pre-eclampsia, and to the arrest of her son, demonstrated she did not react well in stressful situations, and her children should be removed because of her " 'distrust[ ] of certain agencies.' "  She essentially argued this court should review the "[e]rroneous juvenile dependency orders," so that she and her family will be reflected "in the correct light" and protected "from future prejudice and bias cast by uncorrected agency recommendations and judicial decisions

made against law and fact." As discussed, father also argued the jurisdictional findings could prejudice him in future dependency or family law proceedings.

Stigma and potential adverse consequences are factors a reviewing court may consider when deciding whether discretionary review is proper. (*D.P., supra*, 14 Cal.5th at pp. 285–286.) We do not find they weigh in favor of exercising our discretionary review, here, however. Although mother was painted in a negative light, the jurisdictional findings were not based "on particularly pernicious or stigmatizing conduct"—there were no findings of physical or sexual abuse, for example. (*Ibid*.) Similarly, because there were no such findings—and the children were returned to parents' custody at disposition—we find it highly unlikely, as father argues, the jurisdictional findings here would serve as a basis for a detriment finding under section 361.2, or to bypass reunification services under section 361.5, in a hypothetical future dependency proceeding. Nor did parents submit supplemental briefing on remand to advise us of an imminent or pending dependency or family law proceeding where the jurisdictional findings might come into play. Moreover, as was the case in these proceedings, parents' history with the Department would be included in any social worker reports filed in a future dependency proceeding. Thus, even if we were to reverse the jurisdictional findings, the underlying facts would remain part of the record.

Nor do principles of fairness compel us to exercise discretionary review of these moot appeals. True, the appeals here became moot because the juvenile court terminated its jurisdiction at a March 2, 2021 section 364 review hearing—about seven months after the disposition hearing—after finding

the conditions that justified the court's initial assumption of jurisdiction over the children no longer existed and were unlikely to exist if supervision were withdrawn.  We can infer parents participated in the services the Department provided and cooperated with the social workers.  We also can infer that, had they not, the juvenile court would have retained jurisdiction and possibly have made further orders.  In that case, the appeals would not have been moot.  (See § 364, subd. (d) [if court retains jurisdiction after section 364 hearing it "shall continue the matter to a specified date, not more than six months from the time of the hearing"].)

Yet, we do not view a denial of discretionary review here as allowing the " 'forfeiture[ ] of substantial rights on technical grounds,' " as mother put it (quoting *People v. Chapman* (1971) 5 Cal.3d 218, 225), or "insulating erroneous or arbitrary rulings from review," as father put it (citing *In re Marquis H.* (2013) 212 Cal.App.4th 718, 724).  The juvenile court did not base its jurisdictional findings on mother's reactions during childbirth at Kaiser and behavior at the police station alone, as mother appeared to argue in her letter brief.  Indeed, the court stated it would not be relying on mother's reaction during the birth of A.R. to sustain the petition.  The court discussed other evidence demonstrating a risk of harm to the children, as we set forth above.  And, by releasing the children to parents as part of its disposition orders, the court essentially found the Department had not shown by clear and convincing evidence that the children would be unsafe in mother's care *under the supervision of the Department*.  Thus, we do not view the disposition order returning the children, or the court's later termination of its jurisdiction, as somehow confirming the Department had

22

not demonstrated—by a preponderance of the evidence— the children were at substantial risk of harm and, thus, dependent children under section 300, subdivision (b)(1).

Finally, when considering the "overarching goals of the dependency system," we do not conclude they "counsel in favor" of our review here. (*D.P., supra*, 14 Cal.5th at pp. 286–287.) There is nothing to indicate the children's emotional or physical well-being—or the preservation of their family life—would be affected adversely if we decline to review the jurisdictional findings here, as possibly would be the case where findings of abuse remain unreviewed. (See *ibid.* [citing cases where courts elected to review "pernicious" findings that parent exposed children to a substantial risk of physical and sexual abuse].) And, as we said, the children here were ordered returned to mother and to parents at the disposition hearing, thus preserving the family, as well as the children's safety.

Accordingly, having considered the relevant principles and factors discussed in *D.P.*, we conclude discretionary review of parents' moot appeals is not warranted under the specific facts and circumstances present here.

## DISPOSITION

The appeals are dismissed as moot.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.